6 A.3d 963

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BRIAN
M. YOHNNSON, DEFENDANT–RESPONDENT.

Argued February 22, 2010—Decided October 26, 2010.

*Carol M. Henderson,* Assistant Attorney General, argued the cause for appellant (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Cecelia Urban,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice HOENS delivered the opinion of the Court.

Defendant Brian Yohnnson was arrested on outstanding warrants, advised of his rights, and brought to the police station where detectives questioned him about a string of unsolved burglaries. Unbeknownst to those detectives, the arresting officer's recitation to defendant, advising him of his rights, was neither correct nor complete. Because the detectives believed that the arresting officer had properly warned defendant about his rights, they did not re-administer those warnings to him at the police station. Instead, they conducted an interview during which defendant made no incriminating statements. They ended that interview when defendant referred to a family member's advice to him to ask for a lawyer if he were ever arrested. When the detectives then told defendant that they were required to stop questioning him, he attempted to restart the interview without an attorney. The detectives refused to proceed, but allowed him, at his request, to step outside for a cigarette.

During that brief cigarette break, defendant was accompanied by the only available officer who was a smoker. Defendant recognized that officer as someone who he recalled had helped him before and who knew his father, and he began to lament the fact that he had disappointed his parents by using drugs. The officer commented to him that his parents would come around if he got clean. Immediately after returning from the cigarette break, defendant reiterated his request to speak with the detectives. At that point, defendant was fully advised of his rights, following which he formally waived them and confessed.

The Appellate Division, in an unpublished decision, reasoned that those facts represented a variation of the "question-first, warn-later" interrogation procedure that this Court addressed in *State v. O'Neill,* 193 *N.J.* 148, 936 *A.*2d 438 (2007). Applying the five-factor test that we developed in *O'Neill* for courts to use when a suspect's statements were obtained by using the "question-first, warn-later" technique, the Appellate Division concluded that defendant's confession should have been suppressed.

Because the circumstances revealed in this record are far different from the "question-first, warn-later" technique considered in *O'Neill,* and because there is sufficient credible evidence to support the factual findings and credibility determinations made by the trial court in support of its conclusion that defendant's waiver of his rights was knowing, voluntary, and intelligent, we reverse the judgment of the Appellate Division and we reinstate the trial court's order denying defendant's motion to suppress as well as his conviction.

## I.

The facts and the procedural history of this matter are inextricably intertwined, as a result of which we present them chronologically, beginning with the factual record developed during defendant's first hearing on his motion to suppress.

## A.

Moorestown police were investigating a series of robberies when, on the morning of August 18, 2004, a Dunkin' Donuts in the adjoining community of Maple Shade was robbed for the second time in three days. Moorestown Police Detectives Gunning, Leiber, and O'Donnell arrived at the scene first and, when Maple Shade Detective Mikulski arrived, the Moorestown officers told him about the robberies that they were investigating. In particular, because witnesses to the Maple Shade robbery had described the robber and had reported seeing him leave the scene in a blue truck, the Moorestown officers told Detective Mikulski that those

descriptions were similar to the ones they had obtained in their investigations. They told Detective Mikulski that they had identified defendant as a suspect in the Moorestown robberies. Detective Gunning also told Detective Mikulski that defendant was his nephew and, to the best of Detective Mikulski's recollection, revealed at that time that defendant was a heroin addict.

At approximately 3:15 p.m. that day, Patrolman Giannini responded to a call reporting that someone in a blue truck was shooting up drugs behind a pizzeria in Maple Shade. A short time later, he stopped defendant in his blue truck, and arrested him based on outstanding warrants from Camden. Patrolman Giannini then advised defendant of his *Miranda* [1] rights and transported him to the Maple Shade police station. Although a later review of the patrol car's recording equipment revealed that his recitation was inadequate and therefore ineffective, Patrolman Giannini told Detective Mikulski that he had advised defendant of his *Miranda* rights at the scene of the arrest.

Detective Mikulski began speaking with defendant shortly after defendant arrived at the police station. Believing that defendant had already been advised of his rights, Detective Mikulski did not re-administer the *Miranda* warnings, but simply began his interview.[2] Detective Mikulski also recalled that Detective O'Donnell from the Moorestown Police Department, who was investigating the Moorestown robberies, was also present during part of the first interview.

The first interview continued for roughly two hours and forty-five minutes, and Detective Mikulski testified that he spent much of that time talking rather than asking defendant questions. He

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[2] The parties, trial court, and appellate panel, using the *O'Neill* terminology, characterized the first interview as a "pre-interview" or "preinterview" because it occurred prior to the full and complete administration of *Miranda* warnings to defendant. We decline to use that description because the *O'Neill* analysis is inappropriate to apply to these facts.

recalled that he obtained defendant's biographical information and explained to defendant what the police wanted to discuss with him. According to Detective Mikulski, he described for defendant the investigations into the robberies and told him what the police knew about the robberies, although without revealing all of the information that had been gathered. He described "the way the system worked and so forth and what was entailed with this type of crime" as part of his effort to make defendant aware of the situation he was facing "and what potentially could occur." Although Detective Mikulski testified that a composite drawing of the perpetrator that witnesses had described in connection with the Moorestown robberies had been prepared, he could not recall precisely when he showed it to defendant. According to Detective Mikulski, defendant said he had used heroin earlier that day but made no admissions relating to any of the crimes being investigated.

Detective Mikulski testified that after he had been speaking with defendant for some time,[3] defendant said that his uncle, Detective Gunning, had told him that he should have an attorney whenever he was speaking to the police. Although defendant did not ask to consult with counsel or decline to speak to the police except with an attorney present, Detective Mikulski responded to defendant's remark as if it were an assertion of the right to counsel. Detective Mikulski testified that he told defendant that he would have to end the interview, but that defendant responded by "indicat[ing] that he still wished to speak about things." Detective Mikulski refused, advising defendant that the interview could not proceed unless defendant had counsel.

---

[3] Detective Mikulski gave two different estimates of time, one relating to how long the interview lasted and the other based on his estimate of how long after the interview started it was before defendant made his reference to his uncle's advice, but he was steadfast in his testimony that in response to defendant's assertion that his uncle had advised him to have an attorney when speaking to the police, the questioning ceased.

Defendant's testimony on this issue was dramatically different. He testified that he asked for a lawyer because, based on his uncle's advice, he did not want to speak to the police without an attorney present. Defendant testified that, in spite of his request, the detectives did not stop questioning him, but instead tried to coerce him to speak. According to defendant, the police told him that the judge would "play hard ball" with him if he did not cooperate and they used the composite sketch, which they said resembled defendant, in an effort to get him to confess.

Whether or not the words spoken by defendant amounted to an assertion of his right to counsel, and whether or not the police stopped their interview immediately, all parties agree that defendant then requested a cigarette break. Detective Mikulski asked Detective Joseph Gillan, who was the only officer in the department who smoked, to accompany defendant outside for the cigarette break. Detective Mikulski was aware that Detective Gillan and defendant were previously acquainted with each other, but denied that their relationship played a role in his decision to ask Detective Gillan to step outside with defendant during his cigarette break. According to Detective Mikulski, the cigarette break lasted for two to five minutes, and when defendant returned, he again expressed his desire to speak to the police. At that point, full and appropriate *Miranda* warnings were administered to defendant, after which he formally waived them and confessed.

Again, defendant's recollection was different. He testified that he confessed because he felt threatened, coerced, and harassed by the police who were conducting the investigation. In addition, according to defendant, during the cigarette break, Detective Gillan discussed the investigation, revealing to defendant that the police found his fingerprints at the Dunkin' Donuts, that witnesses had given a description of the robber that matched defendant, and that witnesses had also identified defendant's truck. Defendant testified that Detective Gillan mentioned that he "[had] helped [defendant] out before, that he will help [defendant] out again," and urged him to confess if he was involved in the robberies

because of the evidence that the police already had against him. Furthermore, according to defendant, when he returned from the break, the investigating officers continued to pressure him, at which point he decided to say whatever he needed to say in order to leave the room.

Based on all of this testimony, which was developed during the first hearing on defendant's motion to suppress his confession, the trial court made findings of fact and credibility determinations, and concluded that the State had proven beyond a reasonable doubt that *Miranda* warnings had been properly administered, that defendant had waived his rights, and that, considering the totality of the circumstances, defendant's statement was voluntary. In reaching those conclusions, the court noted that because defendant had been arrested on outstanding unrelated warrants, "he knew or should have known that he was not likely to be released that day" regardless of whether or not he was involved in the robberies. The court found further support for its conclusions by noting that defendant's comment to the officers about consulting with an attorney was plain evidence that he knew that he was entitled to refuse to speak with the police, even before being fully advised of his rights.

Moreover, the judge considered and rejected defendant's argument that he was in a "drug induced stupor" when he confessed, noting that the videotape of his arrest and tape recording of his confession belied the truth of that assertion. He rejected for similar reasons defendant's arguments that he did not understand his rights and that he was pressured to confess, finding ample evidence to the contrary in the tapes. Based on those findings and conclusions, as well as the court's determination that defendant only remembered aspects of the incident that would benefit him, the court found defendant not to be credible, and credited Detective Mikulski's testimony.

As a result, the trial court found that the detective was credible in testifying that he treated defendant's comment about counsel as an assertion of that right, that he then stopped the questioning

immediately, that defendant quickly tried to restart the interview, that Detective Mikulski selected Detective Gillan to accompany defendant during the cigarette break because he was the only smoker in the station, and that when defendant returned from having a smoke, he renewed his request to speak. Based on the findings that defendant had repeatedly tried to speak with the detectives after the questioning had stopped, and that he had consented to speak after being fully advised of his rights, the trial court denied the motion to suppress.

After the first hearing and the denial of the motion to suppress, defendant entered a conditional guilty plea and appealed. The Appellate Division expressed a concern that the record was inadequate for it to determine whether defendant's rights had been scrupulously honored, because it was not sufficiently clear about what happened either before or after defendant made his remark about speaking with counsel or what transpired during the cigarette break. The panel therefore remanded the matter for presentation of additional evidence, and directed the trial court to address whether defendant was subjected to interrogation or its functional equivalent before being advised of his rights and whether the police failed to scrupulously honor his rights during the cigarette break.

## B.

During the second hearing, following the remand, Detective Mikulski again took the stand and Detective Gillan testified. Detective Mikulski further explained his reasons for asking Detective Gillan to take defendant out for the break, saying that because he was the officer conducting the interview, it would have been inappropriate for him to accompany defendant on the break. Detective Mikulski reiterated that he did not continue the interview after defendant referred to his uncle's advice about speaking with an attorney, in spite of defendant's requests that he do so. In addition, he testified further about what he recalled saying to defendant before that point in the interview. He testified that he

told defendant that there were witnesses to the August 18, 2004, Dunkin' Donuts robbery and that they could identify the skin color, as well as the approximate height and weight of the perpetrator. Detective Mikulski also testified that defendant was shown a composite drawing, but that he could not recall when that happened.

Detective Mikulski acknowledged that, during the first interview, he tried to elicit responses from defendant about the robberies and that he also made it clear to defendant that he was "a person of interest" in the investigation. He also explained that he was not the only officer who was questioning defendant, because Moorestown Detective O'Donnell pursued a similar line of questioning regarding the robberies there.

Detective Gillan testified that he was working at his desk when Detective Mikulski asked him to take a suspect out for a cigarette break, which was a normal accommodation. Detective Gillan explained that he was acquainted with defendant's father and that he thought he knew defendant "from around town," but he did not know who he would be accompanying until he saw defendant in the interview room. Detective Gillan testified that he was not certain who spoke first during the cigarette break, but recalled that defendant began talking about his drug addiction and his failed attempts at rehabilitation, expressing sadness over having disappointed his parents. Detective Gillan testified that he told defendant "it's not the end of the world" and that if he got cleaned up his parents "would come around."

Detective Gillan testified that neither he nor defendant spoke about the ongoing investigation. He explained that he knew there had been a robbery at the Dunkin' Donuts, but did not know about the perpetrator or his vehicle. He candidly conceded that he could not recall precisely what information he had about the robberies, but answered in the negative when asked on cross-examination if he recalled speaking about the robberies with defendant. However, he testified that he was certain that he would not have compromised the investigation by discussing what-

ever information he did have with defendant. Moreover, he denied telling defendant that as part of managing his addiction, he should be truthful or that he should confess.

After considering the additional testimony, the trial court issued a written opinion, comprehensively setting forth its findings of fact and the reasons for its decisions on credibility. In that written opinion, the court determined that defendant's assertion of the right to counsel was scrupulously honored and reiterated that the State had proven beyond a reasonable doubt that defendant's subsequent waiver of his rights was voluntary, knowing, and intelligent.

In summary, as directed by the Appellate Division, the court first considered whether the police had scrupulously honored defendant's assertion of his right to counsel. *See Michigan v. Mosley*, 423 *U.S.* 96, 103–04, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975) (explaining that *Miranda* requires exercise of right to remain silent to be scrupulously honored); *State v. Bey (I)*, 112 *N.J.* 45, 66–67, 548 *A.*2d 846 (1988) (explaining and applying *Mosley*). In rejecting that challenge to the admissibility of the confession, the court gave three separate reasons. First, the trial court found that "there was no intentionally coercive practice on the part of law enforcement" because Detective Mikulski believed that defendant had been properly advised of his *Miranda* rights when he was arrested. Second, the trial court found that Detective Mikulski in fact ceased questioning defendant as soon as he invoked his right to counsel. Third, the trial court concluded that, because defendant made no incriminating statements during the first, unwarned interview, the *Miranda* warnings given to him after the cigarette break cured the earlier, inadequate ones.

Next, the trial court examined the "question-first, warn-later" nature of the proceedings in accordance with the factors this Court had set forth in *O'Neill*, which was decided after the matter had been remanded. In its analysis of *O'Neill*, the court gave "great weight" to the facts that defendant made no incriminating remarks during the first interview and that the extent, subject

matter, and focus of the first interview "was very broad; simply laying the ground work for the interrogation." For those reasons, the court concluded that defendant's statement was knowing, voluntary, and intelligent.

Turning to issues presented by the cigarette break, the court found that Detective Gillan was credible and that defendant's self-serving testimony was not, concluding that what transpired during the cigarette break was not the functional equivalent of interrogation and thus did not require *Miranda* warnings. In addressing that argument, the trial court considered the Appellate Division's decision in *State v. Rhodes*, 329 *N.J.Super.* 536, 748 *A.*2d 625 (App.Div.), *certif. denied*, 165 *N.J.* 487, 758 *A.*2d 647 (2000), citing numerous reasons for distinguishing it. The court also determined that "it [wa]s clear that police were not attempting to use th[e] fact [that Detective Gillan knew defendant] as a tactic to get defendant to testify." The court then concluded that defendant's expressed desire both before and after the cigarette break to continue questioning demonstrated that defendant had knowingly, voluntarily, and intelligently waived his *Miranda* rights. For all of those reasons, the court again denied the motion to suppress.

C.

In an unpublished opinion, the Appellate Division reversed the order denying the motion to suppress, vacated the conviction and the guilty plea on which defendant's conviction was based, and remanded the matter for trial. Undertaking its own analysis based on the factors this Court identified in *O'Neill*, the Appellate Division rejected the trial court's conclusion that the confession was voluntary.

The panel first rejected the two suggested reasons for distinguishing this case from *O'Neill*, finding it irrelevant that there was no intentional coercion by police and reasoning that the fact that defendant made no incriminating remarks before he was properly advised of his *Miranda* rights was not conclusive. Instead, the panel reasoned that in *O'Neill*, this Court created a rule to govern

the analysis of all two-step interrogations. Applying that test, the panel concluded that each of the five *O'Neill* factors weighed in favor of suppression, whereas only the factor to which we additionally alluded, experience with the criminal justice system, weighed against suppression.

In support of its analysis, the panel considered the testimony relating to the first interview, the officers' response to defendant's reference to his uncle's advice about consulting with counsel, and the events surrounding the cigarette break. In particular, the panel believed that Detective Mikulski's testimony about the time when defendant arguably invoked his right to counsel was inconsistent and faulted his inability to precisely recall the details of everything that he said during that lengthy first interview. Based on its reading of the testimony, the panel decided that the first interview did not stop immediately and that it was "inquisitorial and coercive." That conclusion also led the panel to express its doubt that defendant's assertion of his right to counsel had been scrupulously honored, in part because there was no indication that the police assisted defendant by offering him an opportunity to contact an attorney.

In addition, although not a basis for its decision, the panel surmised that Detective Gillan's comments to defendant during the cigarette break about getting free of his drug habit might be viewed as interrogation, because they might have had the sort of "psychological effect on defendant" that we considered relevant in *O'Neill.*

Rejecting the trial court's interpretation of *O'Neill* as mistaken, the panel found that its factors weighed in favor of suppression because the first interview was lengthy and coercive; the pre- and post-warning interviews, which were interrupted only by the cigarette break, occurred close in time; the interviews were conducted by the same law enforcement personnel; the officers did not warn defendant that whatever he had said in the first interview, even if not incriminating, could not be used against him; and the questioning was essentially a single, continuing interrogation. Finally,

the panel commented that it was "mindful" of its obligation to defer to the trial court's credibility determinations, *see State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999), but concluded that it could use its "common sense and experiences" in reviewing the record to draw its own, contrary conclusions.

We granted the petition for certification filed by the State of New Jersey, 201 *N.J.* 145, 988 *A.*2d 565 (2009), and we now reverse the Appellate Division's judgment.

## II.

In essence, the State argues that the Appellate Division erred by improperly applying the *O'Neill* test and by failing to accord due deference to the trial court's credibility determinations, *see Locurto, supra,* 157 *N.J.* at 470–71, 724 *A.*2d 234. More particularly, the State argues that this case should be distinguished from *O'Neill* because the police did not intentionally withhold *Miranda* warnings; the police did not attempt to elicit incriminating statements that could later be used to psychologically undermine defendant's ability to assert his rights; and defendant made no incriminating statements prior to the time when proper *Miranda* warnings were given to him by Detective Mikulski.

The State argues that instead of trying to apply *O'Neill,* the court should have used the ordinary totality of the circumstances analysis, *see State v. Nyhammer,* 197 *N.J.* 383, 402, 963 *A.*2d 316 ("In determining the voluntariness of a defendant's confession, we traditionally look to the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion."), *cert. denied,* —— *U.S.* ——, 130 *S.Ct.* 65, 175 *L.Ed.*2d 48 (2009), to consider whether defendant knowingly, voluntarily, and intelligently waived his rights prior to confessing. Using that approach, the State argues that there is ample evidence that defendant knew his rights, knew how to assert them, and also knew how to waive them, making his confession admissible.

Finally, the State contends that the appellate panel failed to defer to the trial court's factual findings and credibility determinations, all of which were thoroughly explained and amply supported by the record, and inappropriately substituted its view by making unsupported findings of its own.

Defendant urges us to affirm, arguing that the Appellate Division correctly used and applied the *O'Neill* framework in ordering that his confession be suppressed. He asserts that *O'Neill* should be used to evaluate any two-stage interrogation in which unwarned questioning is followed by warned questioning and that it should apply to this case, and others like it, in which *Miranda* warnings were imperfect.

Further, defendant contends that the intent of the officers who failed to provide full and complete *Miranda* warnings is irrelevant in a two-step interrogation and that the absence of incriminating statements made during the unwarned interrogation is insufficient to meet the standard this Court set in *O'Neill.* Finally, defendant argues that the Appellate Division correctly applied the *O'Neill* factors, and that its conclusion that the State failed to prove beyond a reasonable doubt that he made a voluntary, knowing, and intelligent waiver of his *Miranda* rights is unassailable.

### III.

We begin with a brief recitation of the circumstances that led to our decision in *O'Neill* before we consider whether it was the correct framework to apply to the motion to suppress.

### A.

Our decision in *O'Neill* was based on United States Supreme Court decisions addressing whether a confession given after *Miranda* warnings could be admissible when the suspect had previously been subjected to unwarned questioning. The Court first considered the question in the context of a warned confession that followed unwarned, but uncoerced, questioning. *See Oregon v.*

*Elstad,* 470 *U.S.* 298, 309, 105 *S.Ct.* 1285, 1293, 84 *L.Ed.*2d 222, 232 (1985) (explaining admissibility of warned confession depends on whether confession was "knowingly and voluntarily made"). The defendant in *Elstad* first made an incriminating statement placing himself at a crime scene when answering police questions at his home. *Id.* at 301, 105 *S.Ct.* at 1289, 84 *L.Ed.*2d at 227. Shortly thereafter, during a warned interrogation at the police station, he waived his rights and confessed. *Ibid.* In large part because the police did not use coercion or improper tactics to obtain the first statement, *see id.* at 315, 105 *S.Ct.* at 1296, 84 *L.Ed.*2d at 236, and because the failure to properly warn the defendant before he made the first statement was likely a mistake rather than a deliberate police tactic, *see id.* at 315–16, 105 *S.Ct.* at 1296, 84 *L.Ed.*2d at 236, the Court determined that the confession was not tainted and was voluntary, *see id.* at 318, 105 *S.Ct.* at 1298, 84 *L.Ed.*2d at 238.

When the Court next considered a two-step questioning procedure, the result was different. In *Missouri v. Seibert,* 542 *U.S.* 600, 124 *S.Ct.* 2601, 159 *L.Ed.*2d 643 (2004), the Court confronted a situation in which the police had adopted an official policy of eliciting a confession before providing *Miranda* warnings. *See id.* at 604, 124 *S.Ct.* at 2605, 159 *L.Ed.*2d at 650. A plurality of the Court concluded that in those circumstances, *Miranda* warnings could not function effectively because a suspect would not believe that he really had a right to remain silent after having confessed. *See id.* at 613–14, 124 *S.Ct.* at 2610–11, 159 *L.Ed.*2d at 655–56. In the words of the plurality opinion, "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613, 124 *S.Ct.* at 2611, 159 *L.Ed.*2d at 655–56.

The plurality distinguished *Elstad,* because in that case the first questioning, at defendant's home, was not inherently coercive, *see id.* at 614–15, 124 *S.Ct.* at 2611–12, 159 *L.Ed.*2d at 656–57, because

there was little, if any, "causal connection" between the first unwarned statement and the later confession, and because the failure to advise defendant of his *Miranda* rights was a "good-faith *Miranda* mistake" that could be corrected by subsequent careful warnings, *see id.* at 615, 124 *S.Ct.* at 2612, 159 *L.Ed.*2d at 657.

Justice Kennedy concurred, asserting that *Elstad* should control the analysis unless police deliberately employed a two-step strategy. *See id.* at 622, 124 *S.Ct.* at 2616, 159 *L.Ed.*2d at 661 (Kennedy, J., concurring). In addition, he suggested that even if the use of a two-step approach was deliberate, curative measures, including "a substantial break in time" between the two statements or an added warning explaining that pre-warning statements are not admissible, could serve to break the causal connection and permit admission of the second statement. *See ibid.*

In determining whether incriminating statements are admissible, we have required the State to "prove beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent, and voluntary," *State v. Presha,* 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000); *see State v. Hartley,* 103 *N.J.* 252, 260, 511 *A.*2d 80 (1986) (referring to State's "heavy burden" of proof (quoting *Miranda, supra,* 384 *U.S.* at 444, 475, 86 *S.Ct.* at 1612, 1628, 16 *L.Ed.*2d at 707, 724)), based upon an evaluation of the totality of the circumstances, *Nyhammer, supra,* 197 *N.J.* at 402, 963 *A.*2d 316; *see State v. Dispoto,* 189 *N.J.* 108, 124, 913 *A.*2d 791 (2007) (expressing preference for totality of circumstances approach in analysis of pre-custodial waivers).

In *O'Neill,* we first confronted the "question-first, warn-later" problem. In that case, defendant, who was in custody, was questioned and made an incriminating statement before he was advised of his *Miranda* rights. *O'Neill, supra,* 193 *N.J.* at 154, 936 *A.*2d 438. He then gave two taped confessions after being advised of his rights. *Ibid.* This Court, after analyzing *Elstad* and *Seibert, id.* at 170–76, 936 *A.*2d 438, identified five factors that

should govern courts in deciding whether a two-step interrogation is coercive or not:

> (1) [T]he extent of questioning and the nature of any admissions made by defendant before being informed of his *Miranda* rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.
>
> [*Id.* at 181, 936 A.2d 438.]

In addition to those factors, the Court commented that defendant's prior experience with the criminal justice system would also be relevant. *Ibid.* Applying the factors in *O'Neill,* we concluded that the *Miranda* warnings could not have been effective because defendant was warned only after he had provided the police with a "motive, opportunity, and personal involvement" in the crime. *Id.* at 182, 936 A.2d 438. We explained that defendant therefore probably believed that he had already "crossed a psychological bridge from which there was no turning back" before he was properly warned. *Id.* at 170, 936 A.2d 438.

The rule that we devised in *O'Neill* was both a recitation of familiar themes and the announcement of a new one precise in its application. We reminded our courts that the "focal issue" of the inquiry is whether a defendant has freely and voluntarily waived his rights, and we stated our ruling starkly:

> [W]e hold that when *Miranda* warnings are given *after* a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination.
>
> [*Id.* at 180–81, 936 A.2d 438.]

That is, in *O'Neill* we sought to combat the evil posed by the "question-first, warn-later" method, which is the risk that a defendant will confess, and will then confess again in spite of being warned about his rights, because he will not hear or heed the warnings, believing that he has already crossed that bridge. We did so in recognition of the fact that the "question-first, warn-

later" technique vitiates the prophylactic purpose of *Miranda* because its warnings come too late.

## B.

Although both the trial court and the appellate panel tried to apply *O'Neill* to this case, that framework is not required in the very different factual circumstances presented by this record. First, there was no "question-first, warn-later" methodology being employed here at all. Certainly there was nothing like the formal policy that the Court found unacceptable in *Seibert,* or the less formal but nonetheless clear two-step interrogation technique we addressed in *O'Neill.* Rather, warnings were given imperfectly, and the detectives at the police station had no reason to believe that they had not been properly administered. Although those detectives would have been wiser to re-administer the warnings prior to beginning any questioning, there is nothing in the record that suggests that they hoped that defendant would be unaware of his rights and would therefore speak when he otherwise would refrain. There is no evidence in this record that the interrogating officers pursued a form of the "question-first, warn-later" approach that the United States Supreme Court and this Court have rejected.

Second, in the first part of the interview, which followed the inadequate *Miranda* warnings, defendant said little, and he said nothing at all that was relevant to the robberies being investigated. The only vaguely incriminating statement he made was related to his drug use that day, but his addiction had already been revealed to the detectives by his uncle, Detective Gunning. Our rejection of the "question-first, warn-later" approach is due in part to the risk that, because the defendant has already made incriminating statements, he will not actually hear or comprehend the warnings, or will eventually confess based on a belief that he is merely repeating what has already been said. This record presents no facts that give rise to such a risk and none to suggest that anything that happened prior to the time when defendant was

fully and correctly advised of his rights operated to wear him down psychologically in the manner we found troubling in *O'Neill.* Third, warned or not, defendant actually was aware of at least some of his rights, because he referred to his right to counsel during the first interview.

Those significant differences between this record and the circumstances we addressed in *O'Neill* make it plain that the issue about whether the State bore its burden of proving that defendant's waiver of his rights was knowing, voluntary, and intelligent should be evaluated in accordance with the totality of the circumstances framework. We therefore turn to an analysis of the issues, based on the record compiled by the trial court, and in accordance with that familiar standard.

The trial court made decisions about credibility and findings of fact that were both thorough and comprehensive. Those credibility determinations are entitled to deference and those factual findings must be sustained as long as they are supported by sufficient, credible evidence in the record. *See Locurto, supra,* 157 *N.J.* at 470–71, 724 *A.*2d 234 (quoting *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). In summary, the trial court believed Detective Mikulski and Detective Gillan rather than defendant, largely because many of defendant's assertions, when compared to the objective recordings from the patrol car videotape and the station house recording, were demonstrably false. That was powerful and persuasive evidence on which the trial court was entitled to rely and it was explained in the court's decision with care and precision.

Beyond the credibility determinations, the court's factual findings included: that the first interview was largely devoted to Detective Mikulski's explanations about procedures and his description of the evidence that had been compiled; that defendant referred to his uncle's advice about asking for a lawyer; that Detective Mikulski immediately advised defendant that the interview needed to end because of that comment; that defendant attempted to re-start the interview; that there was no ulterior

motive in sending Detective Gillan outside with defendant for the cigarette break; that Detective Gillan did not discuss the evidence or the robbery investigations; that Detective Gillan did not urge defendant to confess; and that after the break, defendant again reiterated his desire to continue with the interview. Each of those findings is amply supported by the record, and each in turn supported the court's denial of the motion to suppress.

In its review of those credibility determinations and factual findings, the Appellate Division found them wanting. Overlooking the trial court's explanation that defendant's testimony was objectively baseless, the panel disagreed because it found Detective Mikulski's recollection of the details of the first interview to be insufficiently thorough. Moreover, even after the remand hearing, the panel viewed Detective Mikulski's testimony about the total length of time involved in the first interview, when compared with his recollection of how long the interview had gone on before defendant made his comment about consulting with counsel, as inconsistent with his assertion that the interview stopped when defendant made that remark. Based on that perception, the panel attempted to reconstruct a time line for the interview, surmising that as much as ninety minutes might have passed after defendant invoked his right to counsel and before he went for his cigarette break. As part of that evaluation, the panel noted its concern [4] about whether the police had failed to scrupulously honor defendant's invocation of his right to counsel. Although that observation was not part of the basis for its decision, the panel made clear that it rejected Detective Mikulski's assertion that the interview ended immediately after defendant's remark about consulting with

[4] There is a lengthy footnote in the opinion in which the panel comments about its doubt that the police scrupulously honored defendant's invocation of the right to counsel. The footnote appears in the context of the panel's review of the first *O'Neill* factor and its conclusion that the first interview was coercive. The panel did not rule directly on that issue, but expressed its doubt in language that makes its view unmistakable. Although defendant did not file a protective cross-petition, we address the question because it is intertwined with the panel's evaluation of the *O'Neill* factors.

counsel.[5] In short, therefore, the panel used its analysis of the factual record in two ways, both to decide credibility anew based on its finding that Detective Mikulski's recollections of the entire substance of the first interview were inadequate; and to conclude that the first interview had continued when it should have ceased, and therefore was coercive.

Applying our ordinary totality of the circumstances test, we conclude that defendant's confession was knowing, voluntary, and intelligent. We do so because the trial court's findings of fact and credibility determinations are supported by ample evidence in the record and because the appellate panel's contrary conclusions are not. The trial court's credibility findings were based upon specific references to objective evidence that demonstrated that defendant's factual assertions were false and by the court's determination that the testimony of the detectives was believable. To hold otherwise, in light of the careful and comprehensive explanations given by the trial court, would turn *Locurto* on its head.

This record presents us with none of the evils that the United States Supreme Court in *Seibert* or this Court in *O'Neill* sought to eradicate; it is unlike the troubling "question-first, warn-later" technique. Nor is there a basis on which to conclude that Detective Gillan was chosen to take defendant out for a cigarette because he knew defendant or could get him to confess, that he

---

[5] In part, the panel's concern rests on its suggestion that the police were obligated to do more than cease questioning once defendant made his remark about his uncle, commenting, for example, that the police did not escort defendant to a telephone to let him call an attorney. In light of the fact that defendant was under arrest because of the unrelated warrants, and was therefore not free to leave, the police were required only to stop asking questions. *See, e.g., Duckworth v. Eagan*, 492 *U.S.* 195, 204, 109 *S.Ct.* 2875, 2881, 106 *L.Ed.*2d 166, 178 (1989) (commenting that *"Miranda* does not require that attorneys be producible on call, but only that the suspect be informed" of rights); *Moran v. Burbine*, 475 *U.S.* 412, 423 n. 1, 106 *S.Ct.* 1135, 1141 n. 1, 89 *L.Ed.*2d 410, 422 n. 1 (1986) (rejecting "dissent's entirely undefended suggestion that the Fifth Amendment 'right to counsel' requires anything more than that the police inform the suspect of his right to representation and honor his request that the interrogation cease until his attorney is present").

engaged defendant in any conversation designed to exert "inherently compelling pressure [on him] to undermine defendant's will to resist and remain silent and to compel him to speak when he would not do so freely," a stratagem that has been condemned previously, *see Rhodes, supra,* 329 *N.J.Super.* at 541, 748 *A.*2d 625, or that during his five minutes with Detective Gillan defendant was encouraged to confess or crossed a psychological bridge making a confession inevitable.

In the end, the officer's state of mind is not the issue. Instead, our concern is with the objective evaluation of the overall voluntariness of a defendant's statement and with whether there is sufficient, credible evidence to support the findings and conclusions of the trial judge that defendant's confession was knowing, voluntary and intelligent and that his rights were scrupulously honored throughout. We find here no basis on which to conclude that defendant was the victim of the "question-first, warn-later" technique, and no ground on which to suppress his confession.

## IV.

The judgment of the Appellate Division is reversed. The order of the trial court denying defendant's motion to suppress and, consequently, defendant's conviction, are reinstated.

Justice ALBIN, concurring.

I agree with the majority that there was sufficient credible evidence in the record to support the trial court's conclusion that defendant knowingly, voluntarily, and intelligently waived his *Miranda*[1] rights before he gave his confession to the police. I also agree that the Appellate Division exceeded the scope of its reviewing power by substituting its own fact findings for those of the trial court and by reversing the trial court's denial of defendant's motion to suppress his confession.

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

However, I do not agree with the majority that both the trial court and Appellate Division, as well as the State and defendant in their briefs to this Court, used the wrong framework—the standard outlined in *State v. O'Neill*, 193 *N.J.* 148, 936 *A.*2d 438 (2007)—in analyzing whether defendant voluntarily confessed. The trial and appellate courts and the parties rightly concluded that *O'Neill* governed the admissibility of a confession in the context of a two-stage interrogation. In *O'Neill*, relying on our state-law privilege against self-incrimination, this Court adopted a multi-factor test for courts to consider in determining the voluntariness of a confession when the police engage in a two-step interrogation—first questioning a suspect without adequate *Miranda* warnings followed by a proper set of warnings, interrogation, and incriminating statements. *Id.* at 180–81, 936 *A.*2d 438. The Court inexplicably forsakes a framework that it adopted just three years ago.

In the present case, the State concedes that defendant initially was given deficient *Miranda* warnings. Because of the defective warnings, the first two-and-one-half hours of questioning of defendant occurred as if no warnings had been given at all. Although the majority places emphasis on the fact that the first interrogation was preceded by imperfect *Miranda* warnings as opposed to no warnings, under either circumstance, a confession must be suppressed because a defendant cannot exercise his rights unless he is fully informed about those rights. *See Miranda, supra,* 384 *U.S.* at 476, 86 *S.Ct.* at 1629, 16 *L.Ed.*2d at 725 ("The warnings required and the waiver necessary ... are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant."). Indeed, a defendant is presumptively uninformed of his rights unless the State establishes that he was given his full *Miranda* warnings. *See State v. Carty,* 170 *N.J.* 632, 649, 790 *A.*2d 903 (2002) ("failure to give [*Miranda* ] warnings creates an irrebuttable presumption of compulsion as to use of unwarned statements in the State's case-in-chief") (*citing Miranda, supra,* 384 *U.S.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726).

The State does not dispute that any statements provided by defendant during the first interrogation—the time before he was given a complete set of *Miranda* warnings—were inadmissible against defendant. Significantly, defendant did not confess until after he received the requisite *Miranda* warnings. The issue is whether the initial unwarned questioning and any of defendant's responses undermined his ability to exercise effectively his rights when he was fully advised of his *Miranda* warnings.

*O'Neill* placed the focus not on whether the police purposely or inadvertently withheld, at first, the proper warnings in a two-step interrogation case, but rather "on whether a suspect knowingly, voluntarily, and intelligently waived his rights before speaking to the police." *O'Neill, supra,* 193 *N.J.* at 180, 936 *A.*2d 438. We rejected a test that depended on the subjective intent or motive of the police. Indeed, we "avoid[ed] the unworkable standard of delving into a police officer's state of mind." *Ibid.*

Therefore, in addressing the issue of voluntariness, we did not look at whether there was a formal or informal police policy of withholding *Miranda* warnings before the first interrogation, as the majority does here. *Ante* at 60–61, 6 *A.*3d at 973. Rather, from an objective viewpoint, we looked at "whether the defendant properly waived his rights." *O'Neill, supra,* 193 *N.J.* at 180, 936 *A.*2d 438.

In *O'Neill,* we were concerned that a police practice of question-first and warn-later "undermined *Miranda*'s protections and violated our state law privilege [against self-incrimination]." *Id.* at 185, 936 *A.*2d 438. We noted in that case that the dueling opinions in *Missouri v. Seibert,* 542 *U.S.* 600, 124 *S.Ct.* 2601, 159 *L.Ed.*2d 643 (2004)—three in all—had "sown confusion in federal and state courts, which have attempted to divine the governing standard that applies in successive interrogation cases involving warned and unwarned confessions." *O'Neill, supra,* 193 *N.J.* at 175, 936 *A.*2d 438. Because "[t]he shifting sands of federal jurisprudence provide[d] no certainty concerning the standard that might apply to the next set of slightly different facts" from *Seibert,* we turned to

our state law against self-incrimination to develop "workable standards" for police officers and judges "to apply to the complex, ever-changing fact patterns that play out in the real world." *Ibid.* This point is not acknowledged in the majority opinion, which refers to *Seibert* and *Oregon v. Elstad,* 470 *U.S.* 298, 105 *S.Ct.* 1285, 84 *L.Ed.*2d 222 (1985) as though we had not decided on a more precise standard in *O'Neill* under our state law against self-incrimination.[2]

In the setting of a two-stage interrogation, the admissibility of a defendant's confession following unwarned and warned interrogations turns on whether the defendant had "a meaningful opportunity to exercise his [*Miranda*] rights." *O'Neill, supra,* 193 *N.J.* at 180, 936 *A.*2d 438. In other words, the admissibility of post-warning statements depends on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination. In making the determination whether a defendant knowingly, voluntarily, and intelligently waived his rights before speaking to the police in a two-stage interrogation, courts must take into consideration all relevant factors, including:

(1) the extent of questioning and *the nature of any admissions made by defendant before being informed of his Miranda rights;*

(2) the proximity in time and place between the pre- and post-warning questioning;

(3) whether the same law enforcement officers conducted both the unwarned and warned interrogations;

(4) whether the officers informed defendant that his pre-warning statements could not be used against him; and

(5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.

---

[2] In *O'Neill,* we relied "on our own developed jurisprudence, infused with persuasive reasoning from [Justice Souter's] plurality opinion." *O'Neill, supra,* 193 *N.J.* at 176, 936 *A.*2d 438. We therefore rejected the approaches suggested in both the concurrence of Justice Kennedy, who would have looked to the interrogating officer's state of mind in engaging in the two-step interrogation technique, and the dissent of Justice O'Connor, who would not have considered "the coercive impact of the unconstitutionally obtained statement." *Id.* at 174, 176, 936 *A.*2d 438 (citation and internal quotation marks omitted).

[*Id.* at 181, 936 *A.*2d 438 (emphasis added).]

In *O'Neill*, we eschewed a "bright-line rule," emphasizing that "[t]he factual circumstances in each case will determine the appropriate weight to be accorded to any factor or group of factors." *Ibid.* "In a two-step interrogation case, courts must view the totality of the circumstances in light of the relevant factors and then determine whether the unwarned questioning and admissions rendered the *Miranda* warnings ineffective in providing a defendant the opportunity to exercise the privilege." *Id.* at 181–82, 936 *A.*2d 438. In the continuum of cases, we understood that not all cases involving an initial failure to give *Miranda* warnings would lead to suppression of a confession. *Ibid.* Indeed, in an example at one end of the continuum, we suggested that suppression of a confession would be unlikely when "the officers' pre-warning questioning is brief and the defendant's admissions are not incriminating or are barely incriminating and if there is a substantial break in time and circumstances between the pre-and post-warning interrogations." *Id.* at 181, 936 *A.*2d 438.

We never suggested that the *O'Neill* test would lead to suppression of all statements in a two-stage interrogation process. *Id.* at 181–82, 936 *A.*2d 438. We emphasized that the analysis would be fact sensitive. *Ibid.*

Clearly, as pointed out in the majority opinion, the single most important factor in this case is that during the pre-warning questioning, defendant made no statement incriminating himself in any of the crimes charged in the indictment. Therefore, defendant in this case was not in a position to "have concluded that it would have been futile to keep silent after having made a damning admission." *Id.* at 183, 936 *A.*2d 438.

The facts in *O'Neill* stand in stark contrast to those in the present case. In *O'Neill*, detectives interrogated the defendant for one hour and thirty-five minutes without advising him of his *Miranda* rights. *Id.* at 182, 936 *A.*2d 438. Within that time period, unaware of his rights, the defendant provided "the detectives a motive, opportunity, and personal involvement" in a rob-

bery. *Ibid.* The detectives then read the defendant his *Miranda* warnings and exploited the information obtained during the unwarned interrogation session to elicit from the defendant statements implicating him in a felony murder related to the robbery. *Ibid.* In *O'Neill,* during the pre-warning interrogation, the defendant had "incriminated himself, and in all likelihood crossed a psychological bridge from which there was no turning back." *Id.* at 170, 936 *A.*2d 438.

Here, unlike *O'Neill,* during the period defendant was not properly advised of his rights, he did not make any statements implicating himself in the crimes charged in the indictment. The detectives did not obtain a confession from defendant without proper warnings and then have him repeat the confession after reading him a complete set of *Miranda* rights. Defendant did not cross the psychological bridge in *O'Neill*—confessing during the unwarned interrogation—and therefore did not face the compulsion of incriminating himself again when properly advised of his rights. Thus factor number one in the *O'Neill* test—"the nature of any admissions made by defendant before being informed of his *Miranda* rights," *id.* at 181, 936 *A.*2d 438—is the decisive factor outweighing all others. The record supports the trial court's finding that defendant knowingly, voluntarily, and intelligently waived his rights after he was given the proper *Miranda* warnings.

Under the *O'Neill* methodology, I come to the same result reached by the majority. I believe that the majority would be faithful to our recent jurisprudence if it followed that methodology.

I therefore respectfully concur.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.