**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0365-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AKMAL A. ALVARANGA,
a/k/a AKMAL K. RUSSELL,

     Defendant-Appellant.

_____

Argued March 12, 2024 – Decided April 2, 2024

Before Judges Enright, Paganelli and Whipple.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-06-0372.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Steven K. Cuttonaro, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Steven K. Cuttonaro, of counsel and on the brief).

PER CURIAM

Defendant Akmal Alvaranga appeals from his September 27, 2022 judgment of conviction after a jury trial for the murder of Danny Diaz-Delgado. We affirm.

On March 23, 2018, Diaz-Delgado wanted to buy a video game console in anticipation of his younger brother's birthday. He answered a Facebook Marketplace ad offering a PlayStation for sale and arranged to meet the seller at a location in East Trenton. Instead of buying the PlayStation, Diaz-Delgado was robbed of $240, kidnapped, bound with tape, and locked in a garage with defendant, while co-offender Rufus Thompson used Diaz-Delgado's ATM card to withdraw another $740. Defendant stayed with Diaz-Delgado alone in the garage.

Accounts differ as to when Thompson returned to the garage and what happened then, but Diaz-Delgado was eventually loaded—bound and gagged—into the back of a car and driven to a wooded area in Hamilton. There, he was led from the car and walked to the edge of a creek, where he was shot nine times from behind. Later, Thompson and defendant moved Diaz-Delgado's car to a nearby alleyway. The body and the car were located by law enforcement within two days.

2

A-0365-22

Following an intensive investigation, police arrested Thompson and seized his cell phones, which were later forensically analyzed. Information gleaned from Thompson's phones, in combination with other results of the ongoing investigation, led police to arrest defendant. Defendant was interviewed by Detectives Castaldo and Diaz of the Mercer County Prosecutor's Office, who presented him with the Uniform Complaint Arrest Warrant Notification form and the Uniform Rights form. Defendant answered the detectives' questions and detailed his involvement with the case.

Defendant and Thompson were charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree robbery, N.J.S.A. 2C:15-1; first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1), (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). Thompson pled guilty to the murder charge and was sentenced to forty-five-years in prison. Defendant proceeded to trial.

Defendant moved to suppress his statement, asserting Detectives Castaldo and Diaz ignored his assertion of his right to silence. A hearing was held before Judge Robert C. Billmeier, who denied the motion, issuing a

thorough written opinion and order on November 8, 2018. Judge Billmeier found defendant waived his <u>Miranda</u>[1] rights and did not invoke his right to remain silent.

Just before trial, Judge Darlene J. Pereksta granted defendant's motion for reconsideration of his motion to suppress and conducted a hearing. Defendant argued he lacked the capacity to knowingly, intelligently, and voluntarily waive his <u>Miranda</u> rights. One expert each testified for defendant and the State. Judge Pereksta denied defendant's motion to suppress his statement.

A jury trial began before Judge Pereksta a few days later. The jury heard testimony from various officers involved in the investigation, a friend and family members of the victim, and Rufus Thompson. On June 16, 2022, the jury convicted defendant on all charges. Defendant was given a life sentence on the murder charge, with other sentences to run concurrently. This appeal timely followed.

Defendant raises the following issues on appeal, which we record here verbatim:

> I. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HIS

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966).

STATEMENT BECAUSE HE: 1) INVOKED HIS RIGHT TO SILENCE WHEN HE SAID HE DID NOT WANT TO TALK ANYMORE AND DEMANDED THAT HE BE BROUGHT TO JAIL; AND 2) LACKED THE CAPACITY TO MAKE A KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER OF HIS RIGHT TO REMAIN SILENT.

    A. Defendant Invoked His [] Right to Silence When He Said That He Did Not Want to Talk Anymore and Demanded That He Be Brought to Jail.

    B. Defendant Lacked the Capacity To Make a Knowing, Intelligent, and Voluntary Waiver of His Right to Remain Silent.

II. DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S FAILURE TO TAILOR THE DURESS JURY INSTRUCTION TO ACCOUNT FOR DEFENDANT'S UNIQUE LIMITATIONS.

III. GIVEN DEFENDANT'S LIMITED ROLE IN THE CRIME, HIS MANIPULATION BY THOMPSON, AND HIS UNIQUE PHYSICAL AND MENTAL LIMITATIONS, THE LIFE SENTENCE SHOULD BE REDUCED TO A THIRTY-YEAR TERM.

We review a trial court's denial of a motion to suppress for an abuse of discretion. State v. Sims, 250 N.J. 189, 218 (2022). Trial judges are entrusted with "'a wide latitude of judgment,' and, therefore, the trial court's evidentiary ruling 'will not be upset unless . . . there has been a clear error of judgment.'"

5

Ibid. (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).  Similarly, "a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'"  State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)).

"When faced with a trial court's admission of police-obtained statements, an appellate court should engage in a searching and critical review of the record to ensure protection of a defendant's constitutional rights."  State v. L.H., 239 N.J. 22, 47 (2019) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)).  A reviewing court will also generally "defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record."  Ibid. (citing State v. Elders, 192 N.J. 224, 244 (2007)).  Legal questions are reviewed de novo.  Ibid.

As with other credibility determinations, we defer to a trial court's assessment of the weight given to expert testimony, considering it for an abuse of discretion.  State in the Int. of M.P., 476 N.J. Super. 242, 288-89 (App. Div. 2023); see also State v. Yohnnson, 204 N.J. 43, 62 (2010).

We review jury instructions de novo, as jury instructions outline the law that jurors are to apply during deliberations on a case, and a claim of an error

in such instructions is a claim of legal error.  See Restaurant Enters. v. Sussex Mut. Ins. Co., 96 N.J. Super 26, 32 (App. Div. 1967), rev'd on other grounds, 52 N.J. 73 (1968) (finding jury instructions erroneous as a matter of law).

We will generally refuse to consider an issue not raised and addressed at the trial court level unless it is jurisdictional or "substantially implicate[s] public interest."  State v. Walker, 385 N.J. Super 388, 410 (App. Div. 2006) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).  We may consider an issue not raised to the trial court "if it meets the plain error standard or is otherwise of special significance to the litigant, to the public, or to achieving substantial justice, and the record is sufficiently complete to permit its adjudication."  Ibid.

Our review of a sentence imposed by a trial court "is relatively narrow and is governed by an abuse of discretion standard."  State v. Blackmon, 202 N.J. 283, 297 (2010).

## I.

Defendant argues both motion judges erred in denying his motions to suppress portions of his statement to police—first, based on a purported attempt to invoke his right to remain silent and, second, on an inability to voluntarily waive that right.  We address each in turn.

7

"The right against self-incrimination[, encompassing the right to remain silent and the threshold required to waive that right, is] guaranteed by the Fifth Amendment to the United States Constitution and this [S]tate's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). Our courts apply a "totality of the circumstances" analysis in considering whether a defendant's statement was "the product of an essentially free and unconstrained choice" or "the defendant's will [was] [instead] overborne and [their] capacity for self-determination critically impaired." State v. Dorff, 468 N.J. Super. 633, 644 (App. Div. 2021) (first alteration in original) (quoting State v. P.Z., 152 N.J. 86, 113 (1997)). The State bears the burden of proving "beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstance." State v. A.M., 237 N.J. 384, 397 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

Under New Jersey common law, contrary to the Federal practice, defendants need not be clear and unambiguous when invoking their right to remain silent. Compare Berghuis v. Thompson, 560 U.S. 370, 381-82 (2010) ("[A]n accused who wants to invoke [their] right to remain silent [is required]

to do so unambiguously.") with S.S., 229 N.J. at 382 ("[A] request, however ambiguous, to terminate questioning . . . must be diligently honored.") (alteration in original) (quoting State v. Bey (Bey II), 112 N.J. 123, 142 (1988)). Once a defendant in New Jersey indicates, even ambiguously, they want to invoke their right to remain silent, the interrogator is required to cease questioning immediately and—if the invocation was ambiguous—"inquire of the suspect as to the correct interpretation." S.S., 229 N.J. at 382-83 (quoting State v. Johnson, 120 N.J. 263, 283 (1990)).

Defendant argues during his custodial interview with Detectives Castaldo and Diaz on April 13, 2018, he not only demanded to be taken to jail, but also explicitly stated he no longer wanted to speak to them. Defendant asserts: both declarations sufficiently expressed his desire to cease answering questions as to effectively invoke his right to remain silent, the investigators' subsequent questions violated his right to remain silent, and the portion of the statement following the purported invocation of this right should have been suppressed.

Defendant asserts his statement—"Mother fucker take me to jail now. That's where I'm going anyway. Lock me up, just throw away the key, man. Life, fuck it,"—demonstrated his desire to end the interview. But detectives

were not in the room when defendant made that declaration. We cannot conclude it was an effective invocation of his right to remain silent, as the record does not demonstrate whether the police officers heard it and, if so, when they heard it.

Shortly after the detectives re-entered the interrogation room, however, the following exchange occurred:

> DEFENDANT: I know I ain't the smartest person in the world. I know I ain't dumb, neither.
>
> DETECTIVE CASTALDO: Okay.
>
> DEFENDANT: Oh, man, I just want to get this done over with. I don't even want to talk about it no more.[2]
>
> DETECTIVE CASTALDO: You don't want to talk to me anymore, or are you just—
>
> DEFENDANT: No, I don't—
>
> DETECTIVE CASTALDO: I don't understand what you're saying.
>
> DEFENDANT: I've got to deal with him.
>
> DETECTIVE CASTALDO: With who?
>
> DEFENDANT: Even if I don't see him or I see him, I still got to deal with him.

---

[2] Though various transcripts of the interview recorded the second sentence of this declaration as "I don't even want to talk about nothing," Judge Billmeier found defendant had actually said the sentence reported above.

A-0365-22

DETECTIVE CASTALDO: You got to deal with who? Who are you talking about?

DEFENDANT: Rufus. I still got to deal with him.

DETECTIVE CASTALDO: Okay.

DEFENDANT: Either one way or another.

DETECTIVE CASTALDO: Okay.

DEFENDANT: It's not about trial, whatever. It's not like that. It just came down—

. . . .

DETECTIVE CASTALDO: Well, you said something, you don't even want to talk about it.

DEFENDANT: I got to—

DETECTIVE CASTALDO: Do you still want to—

DEFENDANT: I got to make a decision.

DETECTIVE CASTALDO: But do you still want to talk to us?

DEFENDANT: I still got to make a decision of— I know it's the right thing to do. I'm just saying that that's where— I'm trying to think of my head, if he going to do life or he gonna do a couple years. That's what I'm waiting on.

DETECTIVE CASTALDO: Okay. You're talking about Rufus?

DEFENDANT: Yeah.

11

DETECTIVE CASTALDO: Why— why are you worried about—

DEFENDANT: I'm just—

DETECTIVE CASTALDO: —what he's going to do?

DEFENDANT: No, because, it's even to— you know what I mean, like, out there in Trenton, it's either to be killed or be killed. The society is messed up, and that's how that was before.

DETECTIVE CASTALDO: So, are you afraid if he gets out, he's going to hurt you or your family? Is that what you're saying?

DEFENDANT: I'll be happy if he's dead.

DETECTIVE CASTALDO: Why would you be happy?

DEFENDANT: Because at the same time, I don't have no worries.

DETECTIVE CASTALDO: Okay. Do you want to tell me your side of the story anymore or—

DEFENDANT: I feel like— I feel like I did got set up.

DETECTIVE CASTALDO: Okay. Tell me how.

DEFENDANT: I know I'm coming back.

DETECTIVE CASTALDO: How do you feel like you got set up? Talk to me about that.

A-0365-22

DEFENDANT: I'm gonna just tell you the truth, because the same way as my mind already set up, even if you all put me in there with him or you all don't, whatever.

Defendant asserts his statement, "I don't even want to talk about it no more," was a clear and unambiguous invocation of his right to remain silent, and the court erred finding that statement was ambiguous and not clear.

In his November 8, 2018 opinion, Judge Billmeier disagreed, finding "the attendant circumstances . . . warrant a finding . . . defendant's statement was ambiguous." The judge examined proximal statements as well as defendant's tone and manner when he made the statement, while at the same time acknowledging "S.S.'s admonition to avoid valuing considerations such as tone and posture at the expense of the actual words used," (citing 229 N.J. at 385). Judge Billmeier found this case was a "rare one in which . . . defendant's conduct confutes the superficial meaning of his words." After finding defendant's statement ambiguous, the judge determined the investigators responded appropriately with questions narrowly directed at determining whether defendant was willing to continue with questioning and showed considerable forbearance throughout the relevant portion of the interview. According to the judge, defendant also made clear he was not invoking his Miranda rights when he expressed his decision to tell the investigators the

13

truth. Based on a "'searching and critical' review of the record to ensure protection of a defendant's constitutional rights," L.H., 239 N.J. at 47 (quoting Hreha, 217 N.J. at 381-82), Judge Billmeier ruled defendant did not invoke his right to remain silent. Having undertaken the same critical review here, we discern no abuse of discretion.

Defendant's second argument challenges Judge Peretska's ruling rejecting the arguments that physical and mental handicaps prevented defendant from making a knowing, intelligent, and voluntary waiver of his Miranda rights. Defendant contends the trial court erred by crediting the State's expert, Dr. Loius Schlesinger, over defendant's expert, Dr. Daniel Cooke. Based on our review, we discern no abuse of the judge's discretion in doing so.

In crediting Dr. Schlesinger over Dr. Cooke, the trial judge found Dr. Cooke's explanation of defendant's poor test performance and observations of defendant's demeanor during the evaluation implausible and naïve in failing to consider whether defendant was malingering. The trial judge also found Dr. Cooke's explanations of the standard by which to assess competency for purposes of Miranda was not supported by the case law, (citing State v. Carpenter, 268 N.J. Super. 379 (App. Div. 1993)).

14

The court credited the opinion of Dr. Schlesinger, who examined defendant on two separate occasions—for over five hours total—and administered numerous tests, assessing defendant's IQ, personal history, and adaptive functioning—or ability to function in the world. In response to the State's question "whether or not there was an intellectual disability that . . . would somehow impede [defendant's] ability to waive Miranda," Dr. Schlesinger testified, "No, there[ is] no basis to conclude he[ is] intellectually disabled. He has what[ is] called borderline intellectual functioning." Dr. Schlesinger reported defendant "seemed to display a concerted effort to look confused and intellectually limited, particularly when discussing anything that had to do with homicide or court/legal process." Dr. Schlesinger concluded defendant was "intentionally trying to do poorly" on the tests, and he was, instead, "functioning[] and . . . ha[d] a good grasp of important legal concepts, . . . [potentially] more than the average person." He opined defendant was competent to knowingly, intelligently, and voluntarily waive his Miranda rights.

On the other hand, Dr. Cooke asserted defendant displayed no such competence. Dr. Cooke spent about "two and a half to three hours" taking a history, administering tests, and interviewing defendant and concluded

15

defendant had a "mild intellectual disability." Dr. Cooke never assessed defendant's adaptive functioning, because it "would have nothing to do with his ability to make a knowing, intelligent[,] or voluntary waiver of <u>Miranda</u>." He opined, defendant "does not understand th[e] basic right [to remain silent] and could not exercise that right." Dr. Cooke also decided defendant's apparent "lack of effort [in completing a test] is because of feeling pressured, because of getting frustrated when he reaches the limits of his ability, not wanting to say something that[ is] wrong, his tremendous distractibility," and not due to malingering.

Given the deferential standard of review afforded credibility determinations, we conclude there is sufficient credible evidence in the record to support the trial judge's crediting of Dr. Schlesinger over Dr. Cooke and finding defendant "knowingly, intelligently, and voluntarily" waived his <u>Miranda</u> rights; we discern no abuse of the court's discretion.

## II.

Defendant argues for the first time on appeal the trial judge should have sua sponte tailored the jury instruction on duress so jurors could consider defendant's particular susceptibility to Thompson's violent threats, and the court's failure to do so denied his rights to due process and a fair trial. He

argues this failure was clearly capable of producing an unjust result. The court instructed the jury with a charge that closely followed the Model Charge on duress. Because defendant did not object to the charge, we do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder, 62 N.J. at 234).

Even reviewing for plain error, however, "clearly capable of producing an unjust result," State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting R. 2:10-2), we reject this argument. Minimal evidence was advanced during the trial to support the need to specially tailor the duress charge.

## III.

Finally, defendant asks us to remand his conviction for resentencing because the trial judge should have accounted for his "limited role in the crime, his manipulation by Thompson, and his unique physical and mental limitations" when imposing a sentence following his conviction. Defendant contends the trial court should have found mitigating factors two, three, and four:

> (2)   The defendant did not contemplate that the defendant's conduct would cause or threaten serious harm;

(3) The defendant acted under a strong provocation;

(4) There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense.

[N.J.S.A. 2C:44-1(b)(2) to (4).]

Defendant did not directly argue for any specific mitigating factors during the sentencing hearing on September 7, 2022. Counsel, however, did remind the court of the expert testimony presented at the pre-trial hearing regarding impairments and asserted Thompson not only preyed on Danny Diaz-Delgado, but he also preyed on defendant.

Here, the trial judge's sentencing conformed with the appropriate guidelines and addressed aggravating factors upon which all parties agreed: factors three, six, and nine. The trial judge then rejected defendant's assertions his limitations made him particularly susceptible to Thompson's influence and found the aggravating factors clearly substantially outweigh the non-existent mitigating factors. The judge's findings of aggravating and mitigating factors are supported by sufficient credible evidence in the record, and the sentence imposed is not so unreasonable as to shock the judicial conscience.

18

To the extent we have not addressed defendant's remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0365-22