**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5560-16T3

STATE OF NEW JERSEY,

     Defendant-Appellant,

v.

YOHER A. JIMENEZ, a/k/a
YOHER A. CUBILLOS,

     Plaintiff-Respondent.

_____

Submitted March 30, 2020 – Decided June 17, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 11-07-1355.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se reply brief.

PER CURIAM

Defendant Yoher A. Jimenez appeals from his conviction after jury trial of first-degree murder, N.J.S.A. 2C:11-3(a)(1),(2) (count one); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count two); and third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1),(4) (count three), in connection with the death of his live-in paramour's daughter, Valerie,[1] and his concomitant aggregate sentence of life imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a).[2] On appeal, he argues:

> [POINT I]
>
> DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL [(IAC)].
>
>> (A) DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO [IAC] WHEN TRIAL COUNSEL FAILED TO SUBPOENA AN EXPERT WHO HAD EXAMINED THE EVIDENCE AND OPINED THAT THE DEATH WAS DUE TO DROWNING, AND WHICH WOULD HAVE

---

[1] We use a pseudonym to protect the privacy of the victim and her family. See N.J.S.A. 2A:82-46; R. 1:38-3(c)(12).

[2] The life sentence was imposed on count one. The trial court merged count two into count one and imposed a five-year sentence on count three concurrent to count one.

A-5560-16T3

COMPLETELY CONTRADICTED THE STATE'S EXPERT WITNESSES' THEORY ON CAUSATION OF DEATH.

(B) DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO [IAC] WHEN TRIAL COUNSEL FAILED TO OBJECT TO UNDULY PREJUDICIAL TESTIMONY, INCLUDING THE INTERVIEWING DETECTIVE'S EXPRESSION OF OPINIONS AND IMPLICATION THAT THE DEFENDANT WAS "A MONSTER."

[POINT II]

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL AT THE CONCLUSION OF THE STATE'S CASE DUE TO THE TRIAL COURT'S FAILURE TO ALLOW DEFENDANT SUFFICIENT TIME TO CONSULT WITH COUNSEL BEFORE MAKING THE DECISION ON WHETHER OR NOT TO TESTIFY.

[POINT III]

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE COURT DENIED HIS MOTION TO SUPPRESS HIS STATEMENT TO [THE DETECTIVE].

[POINT IV]

IT WAS ERROR FOR THE COURT TO GIVE THE JURY THE INSTRUCTION "FALSE IN ONE, FALSE IN ALL," THEREBY DENYING DEFENDANT THE RIGHT TO A FAIR TRIAL.

[POINT V]

THE SENTENCE OF LIFE IN PRISON WAS EXCESSIVE.

[POINT VI]

THE TRIAL COURT ERRED IN PERMITTING PROPENSITY EVIDENCE IN THE FORM OF PRIOR BAD ACTS OF DEFENDANT.

Unpersuaded, we affirm.

I.

We review the trial evidence in considering defendant's IAC claim. Defendant testified he left thirteen-month-old Valerie in the bathtub while he retrieved boxes from his car. When he returned after ten or fifteen minutes, he found Valerie face down in the tub. Valerie was "having some trouble breathing" and was "gasping for air" so defendant called 911 but had trouble communicating in English. He took Valerie to the superintendent of the building to which he and Valerie's mother had just moved; the superintendent directed emergency personnel to his residence. Despite stout efforts by the EMTs and medical professionals at two hospitals, four days later Valerie was removed from the life support that had been sustaining her. In essence, the defense contended Valerie died from her submersion in the bathtub water.

4

The State presented contrary trial evidence. The Bergen County medical examiner (ME), qualified as an expert in forensic pathology, presented her autopsy findings to the jury. Valerie had fifteen ribs that had been traumatized or fractured; although two fractures were fresh, thirteen were either healed or healing. The ME labeled the multiple, posterior fractures highly suspicious for inflicted injury because they are typically caused by force applied to a young child's torso, not by accident. Valerie's brain was swollen in a symmetrical fashion, but the ME did not observe any evidence of direct injury to the skull. There was an odd cluster of blood vessels on the top surface of the skull, however, and an area of tan discoloration on the left side. The ME did not see any indication of bleeding in the eyes.

The ME determined a neuropathologist—a specialist in diseases and injuries of the brain and spinal cord—should be consulted to do a formal examination of Valerie's brain, eyes, and spinal cord and prepared and shipped specimens to Dr. Douglas Miller, a clinical professor in the Department of Pathology and Anatomical Sciences at the University of Missouri School of Medicine, who had been a professor at New York University for twenty years during which time he was a consultant to the ME's office.

A-5560-16T3

Using slides of brain-tissue cuts to illustrate his findings, Dr. Miller testified at trial that, although there was no direct evidence of fresh trauma to the brain itself, Valerie's brain was clearly swollen, indicating a deprivation of oxygen or blood supply. He identified areas of brown discoloration in the brain tissue that were indicative of an old hemorrhage that probably occurred weeks or months prior to Valerie's death. That evidence of previous head trauma, however, was not related to Valerie's cause of death.

Dr. Miller also used tissue cuts and microscopic cross-sections of the spine to illustrate his examination-finding of hemorrhaging inside the cervical spinal cord at Valerie's C4-C6 levels. Tissue was pushed out of its normal position above and below the location of the hemorrhage in what the doctor termed a "crush injury" of the spinal cord. Dr. Miller testified that a very severe and significant force was required to cause a crush injury of the spine, akin to the sort of injury one might see if an unrestrained child was involved in a high-speed motor vehicle accident.

Dr. Miller explained that hemorrhaging in the tissue around the spinal cord showed the injury unquestionably happened while Valerie was alive; and could not have been the result of the ME's mishandling of the spine after death, or of rough handling of the specimens in transit to him. He opined the acute

A-5560-16T3

"pencil of necrosis with a central loss of tissue" that was apparent from the slides indicated the tissue was dead before Valerie died.

Dr. Miller also found evidence of an old hemorrhage in the thoracic region of the spine, a highly unusual injury in a child caused by significant force. He did not see any retinal hemorrhaging and, hence, no evidence of shaken baby syndrome. His formal findings were:

1. For the brain: (1) "[A]cute hypoxic/ischemic injury, severe. . . . [S]evere hypoxic/ischemic neuronal injury particularly affecting the cerebellar [or] Purkinje cells. . . . [B]rain death prior to somatic death." (2) "[B]lunt head trauma, remote . . . associated with subdural membranes."

2. For the spinal cord: (1) "[C]rush injury, acute, with hemorrhage at the C4 to C6 levels." (2) "[S]ubarachnoid hemorrhage, old, with residual hemosiderin from the T3 to T7 levels."

3. For the eyes: "[N]o abnormality recognized."

When asked about the information that Valerie had been submerged in a bathtub, Dr. Miller stated that submersion in water had no relevance whatsoever to Valerie's death because once the crush injury to the cervical spinal cord occurred, Valerie's ability to breathe ceased. He opined the spinal cord injury was unquestionably the actual cause of death. He deduced a powerful force must have been inflicted such that Valerie's head was suddenly moved ("hyper-flexed") far backward or far forward in a way that caused the bones of her spine

A-5560-16T3

to move against one another. Such a high cervical spinal cord injury is almost always fatal.

When asked on cross-examination if Valerie might have drowned, Dr. Miller admitted that the brain injury, standing alone, might be consistent with drowning. He stated, however, that Valerie would have to have been submerged for a much longer period than the three occasions of five seconds each that defendant had described in one of his versions of events. Dr. Miller admitted he first entertained the possibility of drowning as a cause of death, but rejected it as soon as he saw definite evidence of the spinal cord injury. He emphasized that there was no uncertainty that the spinal cord injury was the cause of Valerie's death.

When the ME received the results of Dr. Miller's examination, she issued a death certificate listing the cause of death as acute cervical spinal cord injury and the manner of death as homicide.

Defendant claims his trial counsel was ineffective for failing to subpoena Dr. Zhongxue Hua, a forensic pathologist, whose trial testimony would have buttressed defendant's defense that Valerie drowned while he left her alone in the bathtub, countering the State's evidence as to her cause of death.

In order to establish a claim of IAC, defendant must satisfy the familiar two-pronged standard formulated in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987), first by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 687); then by proving he suffered prejudice due to counsel's deficient performance, Strickland, 466 U.S. at 687, 691-92. Defendant must show by a "reasonable probability" that the deficient performance affected the outcome. Fritz, 105 N.J. at 58.

"Our courts have expressed a general policy against entertaining [IAC] claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). Consequently, "[IAC] claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." Ibid. The under-developed record on appeal does not allow us to properly evaluate defendant's claim.

Dr. Hua had been consulted by defendant's prior counsel who reported to the trial court on July 22, 2013, that he had yet to receive items he subpoenaed including "the full films [the hospitals that treated Valerie] used to do their

analysis[,] like the MRIs [and a] CAT scan" because Dr. Hua required them for his review. Although not clear from the record, the State contends in its merits brief defendant's former counsel decided sometime prior to August 16, 2016, not to use Dr. Hua as an expert; and on August 25, 2016, defendant agreed to proceed without an expert witness to counter the State's proofs.[3] The transcript of those proceedings is the last we have until January 9, 2017, when defendant's trial counsel appeared—the day before jury selection commenced; that was according to the record, his first appearance on defendant's behalf.

Trial counsel included Dr. Hua, albeit without his full name, on a witness list he submitted on January 3, 2017, and the State moved to preclude his testimony because the defense had not submitted a report or curriculum vitae (CV) from Dr. Hua. See R. 3:13-3(b)(2)(E) (requiring expert's reports to be submitted not later than thirty days prior to trial). Trial counsel represented to the court on January 9, that he had "a commitment, if you would" from the doctor, and had his CV which he intended to exchange with the State when the State gave him its experts' CVs which had been sent to defendant's prior counsel, but not trial counsel. However, he later told the trial court that he "should be

_____

[3] The trial court noted on January 9, 2017, that there was "correspondence going back to 2012 or [20]13 where [defendant's former counsel] said that we discussed getting experts and decided not to get experts."

able to secure" Dr. Hua's report that week "[b]ut [would] have to get a full commitment from [the] expert." Trial counsel later explained that he talked to Dr. Hua, and told the trial court, "[w]e've gone [over] . . . everything. He was previously committed. The Public Defender's Office [(OPD)] chose not to use him. I'm trying to get him to recommit. I sent him—there are two experts' reports. He's looking everything over. We're schedule [sic] to talk today or tomorrow." In response to the trial court's request for a proffer of Dr. Hua's testimony, trial counsel responded: "He is going to basically explain that the alleged spinal cord injury could not and did not happen the way the State is proposing that it happened. [He] [i]s basically going to take their entire medical testimony and put it where it belongs."

Jury selection was still in progress on January 12, 2017, when trial counsel represented he did not have a full report from Dr. Hua but tendered a summary report to the State. The summary report, which the trial court later characterized as a net opinion, synopsized the doctor's review:

> 1. [Valerie's] cause of death was due to her drowning on April 4, 2010.
>
> 2. Her eventual brain death with global brain and spinal hypoxic ischemia changes on [April 8, 2010] was due to her prolonged cardiopulmonary arrest on [April 4, 2010].

11

3. The autopsy described discoloration of outer table of left parietal skull was due to her medical treatment and/or resuscitation.

4. [Valerie's] rib fractures and healed subdural membrane were not related to . . . her cardiopulmonary . . . arrest on [April 4, 2010] and subsequent death.

5. [Valerie] had no evidence of fatal trauma on her head and neck on [April 4, 2010].

The above . . . opinions are within a . . . reasonable degree of medical certainty and I reserve the right to amend them in the event of additional information becoming available.

On January 20 and 25, 2017, trial counsel represented that he expected to call Dr. Hua on February 1. On February 1, trial counsel told the trial court he was trying to contact Dr. Hua, but if the doctor was not able to attend trial that day, he would just "press through it." Trial counsel said Dr. Hua was unavailable because he was testifying in another trial, and there were financial issues with regard to the doctor's compensation. Although arrangements had been made to hold Dr. Miller after he testified so he could hear Dr. Hua's testimony in anticipation of possible rebuttal, trial counsel advised that Dr. Hua would not appear and that Dr. Miller was free to return to his home state.

On February 2, 2017, the court again questioned trial counsel if it was defendant's position that the OPD denied him funds for ancillary services to

retain Dr. Hua. Counsel represented the OPD had agreed to pay for ten hours of consultation, but that Dr. Hua was offended by that offer.

A representative from the OPD,[4] who apparently had entered the courtroom during trial counsel's explanation to the court, was invited by the court to speak to the financial issue. The representative stated that he spoke to Dr. Hua that morning and "the reason Dr. Hua [was] unavailable [was] not because of a money issue but . . . because he[] [was] unavailable." He also said that Dr. Hua "would need more than ten hours." He explained that if it were determined that Dr. Hua's preliminary finding was helpful to the defense, supplemental funding would likely be granted. The representative also conveyed that Dr. Hua advised that he told trial counsel, who he said called him for the first time during defendant's trial:

> He was already scheduled in many different [c]ourts to testify and therefore is unavailable now.
>
> And he would need more – he would need more time to have – review all of the documents, not just a limited amount of information that [trial counsel] provided us – provided him. And he does not recall what he reviewed, you know, years ago on this matter that was provided by our office when we were representing [defendant].

---

[4] In its merits brief, the State identifies the representative as the Deputy Public Defender.

A-5560-16T3

Trial counsel advised the court that was his "first time hearing" of the availability of supplemental funds. The trial court expressed its willingness to accommodate Dr. Hua's schedule, and asked trial counsel to reach out to Dr. Hua again to ask if he could come in anytime, including evenings, during the next few days. Dr. Hua never testified.

We are unable to discern many facts necessary to resolve defendant's IAC claim. We do not know if defendant's prior counsel chose not to retain Dr. Hua because an opinion he formed when first consulted was adverse to defendant's case. We do not know when trial counsel began representing defendant. Trial counsel told the court on January 9, 2017, that the first time he "actually touched base" with Dr. Hua was the Friday before: January 6, 2017. He said Dr. Hua was "vaguely familiar with the case because he had worked with [defendant's prior counsel] two or three years" before. We cannot ascertain when counsel became aware of Dr. Hua, or any need for his expertise. We do not know if trial counsel was dilatory in contacting the doctor. We cannot tell if any dilatory conduct resulted in Dr. Hua's unavailability. We cannot tell if Dr. Hua was truly offended by the financial compensation or what transpired between trial counsel and the OPD regarding that compensation. We do not know the true reason Dr. Hua did not testify.

14

Further, we do not know if counsel's conduct played any part in Dr. Hua's submission of only a summary report—a net opinion that did not address the State's cause-of-death determination. We do not know if counsel's conduct played any part in Dr. Hua's incomplete review of the evidence in advance of defendant's trial. And we do not know what Dr. Hua would have opined in a complete report, same not having been submitted in support of defendant's IAC claim.

We cannot judge if counsel's conduct fell below the Strickland/Fritz first-prong standard, Fritz, 105 N.J. at 52, or if there was a "reasonable probability" that, but for counsel's conduct, the result of the trial would have been different, satisfying the second prong, id. at 58. As such, we leave those issues for post-conviction relief because of the many issues that lie outside the trial record. Preciose, 129 N.J. at 460.

Defendant also claims trial counsel was ineffective because he failed to object to instances of "unduly prejudicial testimony"—which defendant argues was inadmissible lay opinion—by one of the detectives who took defendant's statement at the Prosecutor's Office. Specifically, defendant contends:

> In the interview of . . . defendant played to the jury, [the detective] questioned . . . defendant, "[d]o you want to be remembered as a monster?" Also, [the detective] testified that he wanted to get a "[c]lean

15

version" of events from . . . defendant, implying . . . defendant's version was "dirty" or untruthful. [The detective] testified that he had been conducting interrogations for twenty-five years and never had obtained a false confession, implying that it was his opinion that . . . defendant's ultimate confession could not have been false.

We see no merit in defendant's argument that contorts the detective's testimony. The detective did not call defendant a "monster." The "monster" to which the detective referred was a person from a past case whose actions the detective presented as an "alternative" to defendant's actions. In explaining his interrogation methods to the jury, the detective explained that he provided defendant "with the alternatives of do you want to . . . have people look at you and think that you're such a monster or are you this person who . . . this just happened [to] and you didn't mean it[?]" Likewise, the detective's comment about a "clean version" was an explanation of one of his methods: "try[ing] to let [a suspect or witness] tell . . . what happened without interrupting and asking any questions." Those comments did not express any opinion and were not objectionable; trial counsel was not ineffective when he did not interpose objections.

Defendant also skews the detective's testimony about false confessions. The detective said he had never "had [a false confession] happen" to him but

admitted they did occur. First, that testimony was elicited during cross-examination as trial counsel attempted to establish the flaws in the damaging statement given by defendant. Counsel could not have lodged an objection to the responsive answer. Further, trial counsel's attempt to discredit the detective's interrogation techniques, which he carried to his summation arguing that the detective pursued a theory that defendant was guilty and did not care if he obtained a false confession, did not render his assistance ineffective.

Even if trial counsel's tactics were imprudent, which we do not determine, defendant's "complaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy of representation by counsel." Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963)). "Mere improvident strategy, bad tactics or mistake do not amount to [IAC] unless, taken as a whole, the trial was a mockery of justice." State v. Bonet, 132 N.J. Super. 186, 191 (App. Div. 1975). The simple fact that a trial strategy fails does not necessarily mean that counsel was ineffective. State v. Bey, 161 N.J. 233, 251 (1999).

Defendant also avers trial counsel highlighted the detective's opinion that defendant was untruthful, allowing the detective to describe "[r]ed flag signals" and how defendant's version "[d]idn't seem to fit right" and was "not making

sense" to the detective, and that defendant's body language showed "signs of deception." Defendant argues counsel allowed the detective's testimony that the defendant gave three or four different versions and that defendant's failure to disclose that Valerie expelled clear liquid from her mouth "bothered" and was "concerning" to the detective.

Again, these comments were an attempt to explain the detective's interrogation method in the face of trial counsel's repeated attempt to negate defendant's statement. And trial counsel's attempted strategy did not render him ineffective. In reviewing trial counsel's actions, we heed the standards synopsized by our Supreme Court in State v. Arthur:

> In determining whether defense counsel's representation was deficient, "'[j]udicial scrutiny . . . must be highly deferential,' and must avoid viewing the performance under the 'distorting effects of hindsight.'" State v. Norman, 151 N.J. 5, 37 (1997). Because of the inherent difficulties in evaluating a defense counsel's tactical decisions from his or her perspective during trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689.
>
> In determining whether defense counsel's alleged deficient performance prejudiced the defense, "[i]t is not enough for the defendant to show that the errors had

A-5560-16T3

some conceivable effect on the outcome of the proceedings." Id. at 693. Rather, defendant bears the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

[184 N.J. 307, 318-19 (2005) (alterations in original).]

According the presumption that counsel's conduct fell within the range of reasonable professional assistance, ibid., and adhering to the tenet that "an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial," State v. Castagna, 187 N.J. 293, 314 (2006), we conclude defendant has not established his counsel's performance was deficient.

We determine defendant's remaining arguments regarding trial counsel's alleged ineffectiveness are without sufficient merit to warrant discussion. R. 2:11-3(e)(2). Even if the detective's testimony improperly expressed his belief as to defendant's veracity, see State v. Tung, 460 N.J. Super. 75, 101-02 (App. Div. 2019) (recognizing a witness may not offer an opinion on another witness's credibility), or guilt, see State v. Frisby, 174 N.J. 583, 593-94 (2002) (finding a police officer testifying as a fact witness was not allowed to opine regarding whether the defendant committed the crime), the trial court's timely jury

instruction explained both the purpose of the testimony and clearly explained

that the jurors were the "final arbiters" of credibility:

> [THE COURT]: Counsel, let me just – forgive me, just let me interrupt one second and advise the jury . . . this witness is telling you his technique.
>
> . . . .
>
> But just because this witness believes or says to you he believes that that person is or is not telling the truth, you're not to consider that at all. His opinion on what's the truth doesn't matter, you're ultimately going to decide what's the truth and what's not the truth. He's just telling you why – the reasons why and the mechanism that he does the interview. But I just want to make that clear, that you're going to be the final arbiters of the truth and any opinion of any witness should be disregarded as to what they think the truth is.

The jury was presumed to have followed that instruction, which was echoed in

the court's final instructions. State v. Smith, 212 N.J. 365, 409 (2012).

Defendant obtusely mentioned the "plain error" error standard in making

this IAC argument. See R. 2:10-2 (requiring that we disregard "[a]ny error or

omission . . . unless it is of such a nature as to have been clearly capable of

producing an unjust result"); State v. Ross, 218 N.J. 130, 142-43 (2014). To the

extent he is arguing the trial court erred in allowing the detective's testimony,

the forgoing analysis of the circumstances surrounding that testimony does not

reveal any error, much less one "sufficient to raise a reasonable doubt as to

20

whether [it] led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

## II.

Defendant's argument that he was deprived of a fair trial because the trial court forced him to make a decision about testifying without having adequate time to consult with counsel—allowing him twenty minutes to decide—has no support in the record.

On January 25, 2017, during a scheduling conference, the trial court advised both counsel that "we should be able to sometime Thursday, [February 2, 2017] sum and charge. . . . depending on [defendant's] witnesses," which the court recognized as character witnesses and, possibly, defendant. Defendant's trial counsel expressed no disagreement. At the beginning of proceedings on February 1, 2017, prior to the testimony of Dr. Miller—the State's last witness— the trial court advised trial counsel that after the State rested, it had to address with counsel and defendant if defendant intended to testify. Trial counsel told the court defendant was "still mulling that over"; the court replied that it was "not going to hold him to that right now."

After Dr. Miller testified, the jury was excused at 12:35 p.m. and was told to return at 1:30 p.m. Trial counsel then informed the court that Dr. Hua would not be testifying. This discussion between the court and counsel ensued:

> I suggest that between now – over the lunch break discuss your client's intentions. If he's going to testify we could do that this afternoon. If not – if you have a character witness only we'll – we'll do that tomorrow and then we could sum up. But – and if – if your client's not going to testify I'll go over on the record with him. Then I'll excuse the jury and later, after we take a break, we do a – a charge conference –
>
> [TRIAL COUNSEL]: Okay.
>
> [THE COURT]: – depending on what you want to do.
>
> [TRIAL COUNSEL]: Okay.

After lunch, the trial court explained to defendant his options to testify or not. After defendant said he understood the options, the trial court asked defendant for his decision. Defendant said he was not yet sure; he wanted to speak with trial counsel "in more detail." Although the trial court, considering the long pre-trial and trial process leading to that moment, initially expressed its desire to have defendant's decision that day and offered defendant an extra fifteen or twenty minutes because it did not wish to hold the jury "much later" that day, the trial court relented to trial counsel's entreaty for more time. When defendant's character witnesses, who were supposed to be in court that day, did

22

not appear, the judge decided to release the jury and, invoking N.J.R.E. 611(a),[5]

told trial counsel:

> [I]f [your] client is not testifying today – if he's telling me he's not sure I'll give him that option and the first thing tomorrow morning if you want – well, you – you want to put your character – however you want to do it.
>
> After the character witnesses testify if he's going to – if he's going to testify we'll put him on the stand and then we'll – we'll sum up and do charges. We'll have – I want the jury to have the case tomorrow. Otherwise, if he's not testifying then be ready to sum up. There's no reason why we can't sum up.

Trial counsel replied, "[t]here definitely is no reason why we can't sum up . . .

in the morning if he . . . does."

The next morning, after counsel advised the court he believed defendant

was prepared to state his intentions, the following colloquy took place between

the trial court and defendant:

> [DEFENDANT]: Your Honor, respectfully, I'm – I [want to] apologize for yesterday not making a decision. It was –

---

[5] N.J.R.E. 611(a) provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

A-5560-16T3

[THE COURT]: No. You don't have to apologize. Like you said – like your counsel said, –

[DEFENDANT]: Yeah.

[THE COURT]: – this is –

[DEFENDANT]: I just –

[THE COURT]: – this is your life.

[DEFENDANT]: Yeah. It's –

[THE COURT]: And I – I understand its all – its all coming to the proverbial head and, so, go ahead.

[DEFENDANT]: Yes, Your Honor. And I – I just – first of all I just [want to be] be thankful for the whole process. It was very fair. And my attorneys and – and Your Honor. And I wasn't sure of my decision yesterday but I – I went through deep meditation and we spoke about it. And after seven years I was ready for – you know, for my side of the story to come out. I will then tell Your Honor that I will decide to take the stand.

[THE COURT]: You will take the stand?

[DEFENDANT]: Yes, sir.

Summations did not take place until February 7, 2017.

Defendant had ample opportunity to consult with counsel. We reject his fanciful argument to the contrary.

24

### III.

Judge Liliana S. DeAvila-Silebi,[6] after a two-day evidentiary hearing at which the judge viewed the video of defendant's statement and heard testimony from one of the detectives who questioned defendant at the Prosecutor's Office, denied defendant's motion to suppress the statement he made at the Prosecutor's Office. Challenging that ruling, defendant claims the "failure of the detectives to give . . . defendant his Miranda[7] warnings before engaging him in discussion about himself, where he was living, where he came from, and with whom he was living, deprived . . . defendant of his Fifth Amendment constitutional rights." He contends that part of the statement given after defendant received the warnings was "inadmissible under the doctrine of 'fruit of the poisonous tree,'" citing Wong Sun v. United States, 371 U.S. 471 (1963). We disagree.

We defer to the judge's factual findings on a motion to suppress, "unless they were 'clearly mistaken' or 'so wide of the mark' that the interests of justice require[] appellate intervention." State v. Elders, 192 N.J. 224, 245 (2007) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). We owe "deference to those findings of the trial judge [that] are substantially

---

[6] Judge DeAvila-Silebi was not the trial judge.

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). In State v. S.S., our Supreme Court extended that deferential standard of review to "factual findings based on a video recording or documentary evidence" to ensure that New Jersey's trial courts remain "'the finder of the facts[.]'" 229 N.J. 360, 381 (2017) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The Court explained that "[p]ermitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" Id. at 380-81 (second alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The trial court's application of its factual findings to the law, however, is subject to plenary review. State v. Cryan, 320 N.J. Super. 325, 328 (App. Div. 1999).

In State v. M.L., we recognized the United States Supreme Court's ruling that "Miranda's safeguards 'come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.'" 253 N.J.

Super. 13, 20 (App. Div. 1991) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980)). We further followed that decision, holding

> [n]ot all statements obtained by the police after taking a person into custody, however, must be considered the product of interrogation.
>
> The definition of interrogation has been extended only to a police officer's words or actions that the officer "should know are reasonably likely to elicit an incriminating response from the suspect."
>
> [<u>Ibid.</u> (citation omitted) (quoting <u>Innis</u>, 466 U.S. at 301).]

We agree with Judge DeAvila-Silebi that the detective's questioning prior to the administration of <u>Miranda</u> warnings "elicited general information from defendant that included his pedigree information, cell phone number, and other background information as it related to the victim and the victim's mother." <u>Miranda</u> warnings need not have preceded those ministerial questions. <u>Id.</u> at 21; <u>State v. Cunningham</u>, 153 N.J. Super. 350, 352 (App. Div. 1977). The balance of the pre-warning colloquy consisted of the detective asking defendant if he wanted something to drink, explaining the interview procedure and the investigation, reconfirming defendant's previous consent to search his apartment and ascertaining defendant's ability to understand English. Defendant also took a telephone call from his mother on his cell phone during which the detective

left the room. Defendant's statements just prior to the administration of warnings were not preceded by any questions; in fact, the detective told defendant that he had to wait for the other detective "before [he] continu[ed] any further."

Importantly, defendant did not make any inculpatory statement during the pre-warning colloquy. Thus, our Supreme Court's prohibition on "question-first, warn-later" interrogations, State v. O'Neill, 193 N.J. 148, 180 (2007), holding "when Miranda warnings are given after a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination," id. at 180-81, was not implicated. Nothing elicited during the pre-warning interview provided the detective with defendant's "motive, opportunity, and personal involvement" in Valerie's death, id. at 182, causing defendant to think he had "crossed a psychological bridge from which there was no turning back," id. at 170, thereby obviating the effect of the warnings, see State v. Yohnnson, 204 N.J. 43, 60 (2010). Defendant was not asked about Valerie's death until Miranda warnings were given. The Court's analysis of the facts in Yohnnson are applicable here:

Our rejection of the "question-first, warn-later" approach is due in part to the risk that, because the defendant has already made incriminating statements, he will not actually hear or comprehend the warnings, or will eventually confess based on a belief that he is merely repeating what has already been said. This record presents no facts that give rise to such a risk and none to suggest that anything that happened prior to the time when defendant was fully and correctly advised of his rights operated to wear him down psychologically in the manner we found troubling in O'Neill.

[Id. at 61-62.]

Judge DeAvila-Silebi correctly denied defendant's motion to suppress his statement.

## IV.

Defendant argues the trial court erred by giving the "false in one, false in all" charge to the jury. Although he concedes in his merits brief "[t]here were prior inconsistent statements allegedly given . . . to law enforcement," he argues the instruction was improper because those statements were not "under oath, so it could not be said [he] intended to deceive [the] jury[.]"

Trial counsel did not object to the charge so we consider it for plain error. As we heretofore determined, under that standard, we will not reverse unless "it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2; see Ross, 218 N.J. at 142-43.

The "false in one, false in all" instruction may be given in a situation where a witness "has been discredited out of his own mouth either by cross-examination or by an unimpeached record," State v. Ernst, 32 N.J. 567, 583 (1960) (quoting State v. Sturchio, 127 N.J.L. 366, 369 (Sup. Ct. 1941)), so long as there has been "conscious falsity as to a material fact," ibid. Moreover, "a trial judge in his [or her] discretion may give the charge in any situation in which he [or she] reasonably believes a jury may find a basis for its application." Id. at 583-84.

Defendant gave varying accounts of how thirteen-month-old Valerie came to be critically unresponsive while in his sole care to: the building superintendent, the EMTs and police who responded to a 911 call, a detective at the hospital at which Valerie was treated, detectives during defendant's statement taken at the Prosecutor's Office, Valerie's mother; and at trial. In light of defendant's numerous prior inconsistent statements, the trial court did not abuse its discretion in presenting the instruction to the jury.

Contrary to defendant's argument, the prior alleged false statements need not have been under oath. The instruction allows the jury to assess the testimony of a witness if it "believe[s] that any witness or party willfully or knowingly testified falsely to any material facts in the case, with intent to deceive" the jury.

Model Jury Charge (Criminal), "False in One-False in All" (rev. Jan. 14, 2013). Thus, the focus of the charge was on defendant's testimony under oath. The charge allowed the jury to assess whether defendant intended to deceive the jury through trial testimony that was willfully or knowingly false. The jury could use any prior statement from defendant's "own mouth" in making that assessment, not just those under oath.

## V.

Defendant also argues the trial court erred in admitting evidence under N.J.R.E. 404(b), permitting Valerie's mother to testify: "defendant put [Valerie] 'on her crib hard – he[] put her down hard'"; Valerie returned from a trip to the park with defendant with a "'bluish' mark on her cheek that . . . defendant said came from when he was playing around and pressed her with his lips"; and defendant, while in the car with Valerie and her mother, "turned and just pressed [a crying Valerie's] leg with his hand." Specifically, defendant contends the evidence did not meet the third and fourth prongs of the test for admissibility of such prior-bad-act evidence established in State v. Cofield, 127 N.J. 328 (1992). That test requires the proffering party to prove:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Id. at 338.]

"The admissibility of other-crime evidence is left to the [sound] discretion of the trial court[.]" State v. Covell, 157 N.J. 554, 564 (1999); State v. Marrero, 148 N.J. 469, 483 (1997). "The trial court, because of its intimate knowledge of the case, is in the best position to engage in this balancing process. Its decisions are entitled to deference and are to be reviewed under an abuse of discretion standard." State v. Ramseur, 106 N.J. 123, 266 (1987).

Pursuant to the State's motion to admit defendant's prior acts of violence against Valerie, the trial court found clear and convincing evidence of defendant's prior abuse from defendant's admission in his statement at the Prosecutor's Office "to striking the child . . . on prior occasions, to biting the child . . . in the face, [and] to the [child's] broken ribs." The court, at that early proceeding, also anticipated that the doctors called by the State would testify in accordance with their reports about Valerie's injuries, both old and new.

A-5560-16T3

In fact, in his statement defendant admitted hitting Valerie on the back, front and leg over a nine-month period and biting her on the face. Dr. Miller testified of his findings of an old hemorrhage in the thoracic region of the spine. And Valerie's mother testified about the evidence defendant now challenges. The trial court's findings of clear and convincing evidence were supported.

The trial court carefully weighed the probative value of the evidence against its prejudicial impact, obviously recognizing that admission of prior bad acts under N.J.R.E. 404(b) is inevitably problematic; "such evidence creates the strong potential for prejudice because of its natural 'tendency to demonstrate a criminal predisposition.'" State v. Blakney, 189 N.J. 88, 93 (2006) (quoting State v. G.S., 145 N.J. 460, 468 (1996)). The court found there was "clear prejudice" to defendant from the proffered evidence but "on balance" it did not outweigh the probative value. The court also considered that defendant was contending Valerie's death was accidental, and his actions were not purposeful or knowing, so as to satisfy those elements of murder. The court weighed the relevance of the proffered prior acts, ultimately ruling the evidence was more relevant than prejudicial to show defendant's intent and lack of mistake or accident, but the evidence was more prejudicial than probative to show defendant's motive.

The trial court's pragmatic evaluation in the context in which the evidence was to be offered, see State v. Long, 173 N.J. 138, 162 (2002), was not an abuse of discretion.  "[E]vidence claimed to be unduly prejudicial can be excluded only where its probative value 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the basic issues of the case." Covell, 157 N.J. at 568 (second alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).  The trial court fully recognized that tenet, further evidenced by its careful instruction regarding the prior-bad-acts evidence—which is unchallenged by defendant.  We, therefore, reject defendant's contention that the trial court erred in finding the third and fourth Cofield prongs were met.

## VI.

Finally, defendant contends his life sentence was manifestly excessive, claiming the trial court erred in finding aggravating factors one and two, N.J.S.A. 2C:44-1(a)(1), (a)(2)[8] and "failed to properly weigh the aggravating

---

[8]  Aggravating factor one considers:  "The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner[.]"  N.J.S.A. 2C:44-1(a)(1).  Aggravating factor two considers:

and mitigating factors for sentencing in giving . . . defendant a sentence above the mid-range." We determine these sentencing arguments are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). We briefly add the following comments.

The record, including the ME's and Dr. Miller's testimony, supports the trial court's finding that Valerie's death was caused by defendant's "extremely and extraordinarily brutal act" that finding alone fully supports the court's finding of aggravating factor one. That the "brutal act" was committed on a thirteen-month old child entrusted to defendant's care fully supports the court's finding aggravating factor two. Defendant does not otherwise explain how the trial court improperly weighed the aggravating and mitigating factors.

---

The gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance.

[N.J.S.A. 2C:44-1(a)(2).]

A-5560-16T3

Our review of the record leads us to conclude the sentencing guidelines were followed, the aggravating and mitigating factors found below were based upon competent credible evidence in the record, and the application of the guidelines to the facts resulted in a sentence that was clearly reasonable under the facts of the case and did not "shock the judicial conscience." See State v. Roth, 95 N.J. 334, 364-65 (1984).  Under our deferential standard of review, State v. Dalziel, 182 N.J. 494, 500 (2005), we see no reason to second guess the trial court's sentence, id. at 501.

We determine defendant's remaining arguments, to the extent not here addressed, to be without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5560-16T3